Scott C. Clarkson, Esq. (CA Bar No. 143271)
Eve A. Marsella, Esq. (CA Bar No. 165797)
Israel Saperstein, Esq. (CA Bar No. 084471)
**Clarkson, Gore & Marsella, APLC**
3424 Carson Street, Suite 350
Torrance, California 90503
Telephone: 310/542-0111
Facsimile: 310/214-7254
Email: sclarkson@lawcgm.com

Attorneys for Plaintiff MTI Technology Corporation, Debtor-In-Possession

# UNITED STATES BANKRUPTCY COURT

## CENTRAL DISTRICT OF CALIFORNIA, SANTA ANA DIVISION

| | |
|---|---|
| In re:<br><br>MTI TECHNOLOGY CORPORATION, A Delaware corporation,<br><br>Debtor and Debtor in Possession.<br><br>---<br><br>MTI TECHNOLOGY CORPORATION, A Delaware corporation,<br><br>Plaintiff,<br>vs.<br><br>FUSIONSTORM, A Delaware corporation; JOHN VAREL, an individual; DANIEL R. SERPICO, an individual, MARC FRANZ, an individual; CHRISTOPHER BUTTS, an individual; RICHARD BOCCHINFUSO, an individual; MATTHEW DWYER, an individual; JUSTIN GRIFFIN, an individual; DIMITRIS KREKOUKIAS, an individual; ROBERT LINSKY, an individual; ROBERT OWEN, an individual; HEEKI PARK, an individual; GREG PRESTININZI, an individual; and, THOMAS TAR, an individual,<br><br>Defendants. | Case No. 8:07-bk-13347-ES<br>Chapter 11<br>Adv. No.<br><br>**COMPLAINT FOR:**<br><br>**(1) BREACH OF CONTRACT;**<br>**(2) BREACH OF FIDUCIARY DUTY;**<br>**(3) BREACH OF COMMON LAW DUTY OF LOYALTY;**<br>**(4) BREACH OF STATUTORY DUTY OF LOYALTY;**<br>**(5) INTENTIONAL INTERFERENCE WITH CONTRACT;**<br>**(6) INTENTIONAL INTERFERENCE WITH PROSPECTIVE ECONOMIC ADVANTAGE;**<br>**(7) UNFAIR COMPETITION, BUSINESS & PROFESSION CODE §17200;**<br>**(8) VIOLATION OF CALIFORNIA UNIFORM TRADE SECRET ACT; AND**<br>**(9) BREACH OF COVENANT OF GOOD FAITH AND FAIR DEALING;**<br><br>**AND OBJECTION TO PROOFS OF CLAIMS FILED BY CHRISTOPHER BUTTS (CLAIM NO. 63); MARC FRANZ (CLAIM NO. 96); ROBERT LINSKY (CLAIM NO. 497); ROBERT OWEN (CLAIM NO. 246)**<br><br><u>Status Conference:</u><br>DATE:    [To Be Set By Summons]<br>TIME:    [To Be Set By Summons]<br>PLACE:   Courtroom 5A |

1   Plaintiff, MTI Technology Corporation, the above-captioned debtor and debtor in
2   possession, ("Plaintiff" or "MTI" or "Debtor"), alleges in its Complaint ("Complaint") against
3   defendants FusionStorm, A Delaware corporation, John Varel, Daniel Serpico, Marc Franz,
4   Christopher Butts, Richard Bocchinfuso, Matthew Dwyer, Justin Griffin, Dimitris Krekoukias,
5   Robert Linsky, Robert Owen, Heeki Park, Greg Prestininzi, and Thomas Tar, (FusionStorm,
6   Varel, Serpico, Franz, Butts, Bocchinfuso, Dwyer, Griffin, Krekoukias, Linsky, Owen, Park,
7   Prestininzi, and Tar are collectively referred to herein as "Defendants") as follows:

## JURISDICTION, VENUE AND PARTIES

8
9   1.    The Complaint initiates an adversary proceeding as contemplated by Rule 7001(1) of
10  the Federal Rules of Bankruptcy Procedure. All of the Claims for Relief in the Complaint are
11  either core proceedings as that term is defined in, without limitation, 28 U.S.C. §§ 157(b)(2)(A),
12  (B), (C), (E), and (O) or are proceedings arising under title 11 or arising in or related to a case
13  under title 11, as set forth in 28 U.S.C. §157(b)(1) and (b)(4).
14  2.    Pursuant to 28 U.S.C. §§ 1334(b), 157(a), General Order No. 266 entered by the US
15  District Court for the Central District of California on October 9, 1984, and 157(b)(1), the above
16  entitled court (the "Court") has jurisdiction over this adversary proceeding.
17  3.    On October 15, 2007 (the "Petition Date"), MTI filed its voluntary petition for relief
18  under Chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the Central
19  District of California, Santa Ana Division, styled In re MTI Technology Corporation, Bankruptcy
20  Case No. 8:07-bk-13347-ES ("MTI's Chapter 11 Case").
21  4.    Pursuant to 28 U.S.C. §1409(a), venue for the prosecution of this adversary
22  proceeding is proper in the above entitled District by virtue of MTI's pending Chapter 11 Case.
23  5.    MTI has standing to prosecute and enforce all claims asserted herein belonging to
24  MTI's bankruptcy Estate pursuant to, without limitation, 11 U.S.C. §§ 541(a)(1), 541(a)(3), and
25  1107(a).
26  6.    By filing a Proof of Claim against the above captioned bankruptcy estate (the
27  "Estate"), Defendants have waived any right to a jury trial that they may have had.
28

CLARKSON, GORE & MARSELLA, APLC
Attorneys At Law
Torrance, California

-2-

## THE PARTIES

7. Plaintiff is informed and believes, and on that basis alleges, that at all times mentioned herein, Defendant FusionStorm is a corporation organized and existing under the laws of the State of Delaware, having a principal place of business in San Francisco, California, as well as a business office in Irvine, California ("FusionStorm").

8. Plaintiff is informed and believes, and on that basis alleges, that at all times mentioned herein, Defendant John Varel ("Varel") is an individual who resides in Maui, Hawaii and San Francisco, California. Plaintiff further believes that Varel is, and was at all times relevant, the Chairman of the Board and Chief Executive Officer of FusionStorm and that as Chief Executive Officer, Varel is responsible for the operations of FusionStorm.

9. Plaintiff is informed and believes, and on that basis alleges, that at all times mentioned herein, Defendant Daniel R. Serpico ("Serpico") is an individual who resides in San Francisco, California. Plaintiff further believes that Serpico is, and was at all times relevant, the Chief Financial Officer, and a director, of FusionStorm and that as Chief Financial Officer, Serpico is responsible for the operations of FusionStorm.

10. Plaintiff is informed and believes, and on that basis alleges, that at all times mentioned herein, Defendant Marc Franz ("Franz") is an individual residing in the County of Orange, in the State of California. Plaintiff is further informed and believes that Franz is currently employed as a sales representative of FusionStorm and that Franz works out of FusionStorm's Irvine office.

11. Plaintiff is informed and believes, and on that basis alleges, that at all times mentioned herein, Defendant Christopher Butts, ("Butts") is an individual residing in the City of Redwood, in the State of California and that Butts is currently employed by FusionStorm.

12. Plaintiff is informed and believes, and on that basis alleges, that at all times

mentioned herein, Defendant Richard Bocchinfuso, ("Bocchinfuso") is an individual residing in the City of Manalapan, in the State of New Jersey and that Bocchinfuso is currently employed by FusionStorm.

13. Plaintiff is informed and believes, and on that basis alleges, that at all times mentioned herein, Defendant Matthew Dwyer, ("Dwyer") is an individual residing in the City of Princeton, in the State of New Jersey and that Dwyer is currently employed by FusionStorm.

14. Plaintiff is informed and believes, and on that basis alleges, that at all times mentioned herein, Defendant Justin Griffin, ("Griffin") is an individual residing in Little Silver, in the State of New Jersey and that Griffin is currently employed by FusionStorm.

15. Plaintiff is informed and believes, and on that basis alleges, that at all times mentioned herein, Defendant Dimitris Krekoukias ("Krekoukias") is an individual residing in Elk Grove Village, in the State of Illinois and that Krekoukias is currently employed by FusionStorm.

16. Plaintiff is informed and believes, and on that basis alleges, that at all times mentioned herein, Defendant Robert Linsky ("Linsky") is an individual residing in the City of Hewlett, in the State of New York and that Linsky is currently employed by FusionStorm.

17. Plaintiff is informed and believes, and on that basis alleges, that at all times mentioned herein, Defendant Robert Owen ("Owen") is an individual residing in the City of Hawthorne, in the State of New Jersey and that Owen is currently employed by FusionStorm.

18. Plaintiff is informed and believes, and on that basis alleges, that at all times mentioned herein, Defendant Heeki Park ("Park") is an individual residing in the City of Edison, in the State of New Jersey and that Park is currently employed by FusionStorm.

19. Plaintiff is informed and believes, and on that basis alleges, that at all times mentioned herein, Defendant Greg Prestininzi ("Prestininzi") is an individual residing in the City of Shrewsbury, in the State of New Jersey and that Prestininzi is currently employed by

1  FusionStorm.

2  20.    Plaintiff is informed and believes, and on that basis alleges, that at all times
mentioned herein, Defendant Thomas Tar ("Tar") is an individual residing in the City of Denville,
in the State of New Jersey and that Tar is currently employed by FusionStorm.

21.    Defendants Tar, Prestininzi, Park, Owen, Linsky, Krekoukias, Griffin, Dwyer,
Butts, and Bocchinfuso were all former MTI employees employed in MTI's East Coast Division
("East Coast Division"), which was comprised of several primary teams, including the New York
and New Jersey team (sometimes also knows as the Mid-Atlantic team), the Virginia team and the
New England team.

### GENERAL ALLEGATIONS COMMON TO ALL CLAIMS FOR RELIEF

22.    MTI was founded in 1987. In 1994, it became a publically-traded company on the
NASDAQ, until 2007. By 2007, MTI was a global provider of infrastructure solutions for the
management and storage of electronic data ubiquitous in computers of mid to large size
companies.

23.    At all times relevant herein, MTI had its headquarters in Orange County,
California, but maintained offices throughout the country, including New Jersey.

24.    For more than 20 years, MTI operated its business of delivering high-performance
data storage solutions to customers with mid- to- large scale computer information systems. For
its customers, MTI designed, constructed, and serviced fully integrated solutions for the
management, storage, backup, and retrieval of electronic data used in computer systems.

25.    MTI purchased from suppliers and resold to its customers specialized data storage
equipment. In addition, MTI obtained licenses for specialized software from suppliers and sold
the software to its customers, who executed the software licenses directly with the supplier.

26.    Regularly, MTI added value to the re-sold specialized equipment and the re-sold
specialized software by assessing customers' computer data storage system requirements,

designing customized configurations for the resold hardware, and providing installation, technical support, and maintenance services, to assure that all systems and equipment functioned properly.

## MTI'S STRATEGIC 20-YEAR PROCESS FOR CUSTOMER ACQUISITION AND RETENTION ENABLED MTI TO DEVELOP ITS HIGHLY SKILLED AND TRAINED EAST COAST DIVISION, WHICH BECAME ONE OF ITS MOST PROFITABLE DIVISIONS.

27.   MTI invested a great deal of time, money (in excess of several million dollars per year) and effort developing its extensive and lengthy customer list and client acquisition. MTI had undertaken and developed a formalized and sophisticated process for customer acquisition and retention over a 20-year period. As part of this process, in 2003, MTI shifted its business focus plan to aggressively pursue a unique partner-relationship with EMC for the exclusive sale of EMC products, as follows:

a. Employing and investing in a highly-skilled telemarketing group to research and generate customer leads;

b. Spending on average $500,000.00 each quarter in marketing and branding the MTI name;

c. Employing advertising agencies, public relations firms, and industry analysts, and purchasing customer lists at a cost of hundreds of thousands of dollars;

d. Expending countless hours of time and effort to identify, and gain access to decision-makers, relative to each potential customer;

e. Utilizing hundreds of hours of salesperson visits to potential customers, many of which took months, and sometimes years, to acquire;

f. Entertaining potential and present customers;

g. Attending trade shows, seminars, and conferences all over the country;

      h. Entering into an agreement with EMC, at MTI's cost of $800,000.00, for extensive technical certification of MTI salespeople, technical employees, service people, and systems engineers, in EMC systems and products[1]; and

      i. Building and maintaining an electronic database with customer information unique to each customer's specifications, needs, services, products, maintenance contracts, and systems.

      28. Ultimately, MTI molded and created the East Coast Division, which became its premiere division. The team consisted of sales people, technical architects, telemarketers, support staff, engineers, and a vice president/officer. This team was able to address every aspect of MTI's customer's needs due to the extensive training, and certifications provided by MTI. The team was able to ferret out customer leads, make contacts with decision makers, ascertain the customer's needs, define customer pricing, and obtain customer quotes detailing pricing, services to be rendered, and product configurations, as well as work out the necessary systems and products, and provide the technical architects and engineers to make the products work for the customer's purpose. They also obtained statements of work, which contained the detail regarding the service, delivery, and customer acceptance criteria, as well as obtained special pricing directly from EMC, if needed to win the business in a competitive bid environment.

      29. In the course of its dealings with its customers, MTI's East Coast Division became knowledgeable and experienced in its customers' operations, and developed sophisticated customer information within the customer's business, such as special needs, customer characteristics, profit margins, maintenance contract renewal dates, and other pertinent information. It was precisely the team that MTI had envisioned that it would create and which would ultimately pay dividends. All of this information was the product of substantial time and expense, not generally known to the public, nor readily ascertainable in the industry. MTI developed an in-depth source to determine which particular businesses might be planning future additions or upgrades to their data storage systems. MTI's customers' names, specialized

---

[1] In order to do business with EMC, salespeople, technical installers, and technical architects had to undergo an EMC accreditation training program, paid for by the business which sought to enter the EMC product competition. Such accreditations had to be maintained and recertified on an annual basis.

1 requirements and patronage were secured by the lengthy process set forth above, at considerable
2 time, effort, and expense to MTI.

3    30.    All of the above actions were investments undertaken by MTI to have its ingenuity
4 and efforts pay off in the free marketplace, with the expectation that it would be protected from
5 gratuitous use by competitors.

6    31.    FusionStorm was a competitor in the same market as MTI, attempting to expand
7 into MTI's markets. Upon information and belief, FusionStorm is a national provider of
8 technology solutions for enterprises of all sizes. FusionStorm provides network security, enterprise
9 storage, wireless telecommunication services, hardware and software procurement, system
10 engineering, technical support services, network hardware and software solutions. MTI is
11 informed and believes FusionStorm was seeking to aggressively expand its sales of EMC data-
12 storage solutions, and targeted MTI employees for this purpose.

13    32.    In 2007, MTI, unlike FusionStorm, was EMC's eighth largest partner and was its
14 third largest VAR ("Value Added Re-Seller") purchasing up to $80 million annually from EMC.
15 As a result of this position with EMC, MTI purchase directly from EMC, and could obtain better
16 pricing and benefits for its customers, than smaller companies such as FusionStorm, who were
17 required to purchase EMC products through a third party distributor. Moreover, to achieve this
18 positioning with EMC, MTI was required to expend costs associated with the training and
19 certification of its employees, such as those associated with its East Coast Division (upon whom it
20 expended approximately $1,000,000 for this purpose) in the acts detailed above.

## MTI'S EAST COAST DIVISION WOULD BETRAY MTI ON BEHALF OF FUSIONSTORM

23    33.    On or about April 2, 2004, MTI hired Richard Bocchinfuso as the Director of
24 Technical Sales Operation. Bocchinfuso executed a Confidentiality and Nondisclosure Agreement
25 (the "Confidentiality Agreement"). Attached hereto as **Exhibit "A"** is a true and correct copy of
26 the Confidentiality Agreement. The Confidentiality Agreement contains provisions prohibiting
27 business activities which conflict with his employment. The Confidentiality Agreement also
28 prohibits the solicitation for employment MTI's employees on behalf of himself or any third party.

-8-

1  On or about October, 2005, Bocchinfuso was promoted to an officer as MTI's Chief Technical
2  Officer. Bocchinfuso tendered his resignation on or about July 20, 2007. MTI is informed and
3  believes that Bocchinfuso was immediately hired by FusionStorm, and is currently still employed
4  by FusionStorm.

5      34.    On or about June 12, 2000, MTI hired Christopher Butts as a Sales Support
6  Account Manager. Butts executed an Employee/Consultant Proprietary Information Agreement
7  ("Employment Agreement"). Attached hereto as **Exhibit "B"** is a true and correct copy of the
8  Employment Agreement. The Employment Agreement contains provisions acknowledging that
9  proprietary information was to be held in strict confidence, considered to be privileged and
10 confidential, prohibited him from soliciting for employment or recommend for employment any
11 person employed by MTI, and upon termination, required Butts to surrender all property and
12 material containing MTI's trade secrets, restricted Butts from diverting or attempting to divert
13 from MTI any business of any kind including solicitation or interference with any suppliers or
14 customers, and prohibited Butts from engaging in competition with MTI while making use of
15 MTI's trade secrets. Butts tendered his resignation on July 19, 2007. MTI is informed and
16 believes that Butts was immediately hired by FusionStorm, and is currently still employed by
17 FusionStorm.

18     35.    On or about September 3, 2004, MTI hired Matthew Dwyer as a Professional
19 Services Consultant. In or about January, 2007, he was promoted to East Director of Technical
20 Architect Manager. Dwyer executed an offer letter. On or about October 18, 2004, Dwyer
21 executed a Use & Compliance Agreement Form, a true and correct copy of which is attached
22 hereto as **Exhibit "C."** In addition, it contains a provision which states, "Do not format or FDISK
23 the hard drive or delete any data." Dwyer tendered his resignation on July 20, 2007. MTI is
24 informed and believes that Dwyer was immediately hired by FusionStorm, and is currently still
25 employed by FusionStorm.

26     36.    On or about August 8, 2003, MTI hired Marc Franz as a Sales Representative.
27 Franz executed a Confidentiality and NonDisclosure Agreement, a true and correct copy of which
28 is attached hereto as **Exhibit "D."** On August 27, 2003, Franz executed a Use & Compliance

-9-

Agreement for use of a MTI laptop, a true and correct copy of which is attached hereto as **Exhibit "E"**. The Use & Compliance Agreement expressly states that upon termination the laptop is to be returned to MTI. In addition, it contains a provision which states, "Do not format or FDISK the hard drive or delete any data." Franz tendered his resignation on May 14, 2007. However, he extended his position to part-time through June 30, 2007. MTI is informed and believes that Franz was immediately hired by FusionStorm, and is currently still employed by FusionStorm.

37.    On or about January 24, 2004, MTI hired Justin Griffin. Griffin executed a Confidentiality and NonDisclosure Agreement, a true and correct copy of which is attached hereto as **Exhibit "F."** Griffin tendered his resignation on July 20, 2007. MTI is informed and believes that Griffin was immediately hired by FusionStorm, and is currently still employed by FusionStorm.

38.    On or about July 22, 2005, MTI hired Dimitris Krekoukias as a Sales Engineer. Krekoukias executed a Confidentiality and NonDisclosure Agreement Agreement, a true and correct copy of which is attached hereto as **Exhibit "G."** On August 8, 2005, Krekoukias executed a Use & Compliance Agreement, a true and correct copy of which is attached as **Exhibit "H,"** for use of the MTI laptop. The Use & Compliance Agreement expressly states that upon termination the laptop is to be returned to MTI. In addition, there is a provision that states "Do not format or FDISK the hard drive or delete any data." Krekoukias tendered his resignation on July 20, 2007. MTI is informed and believes that Krekoukias was immediately hired by FusionStorm, and is currently still employed by FusionStorm.

39.    On or about October 21, 2002, MTI hired Robert Linsky as the Vice President of Product Management and Marketing. Linsky executed an Employee Proprietary Information Agreement, a true and correct copy of which is attached hereto as **Exhibit "I."** Linsky tendered his resignation on July 20, 2007. MTI is informed and believes that Linsky was immediately hired by FusionStorm, and is currently still employed by FusionStorm.

40.    On or about November 17, 2005, MTI hired Robert Owen as a Sales Engineer. Owen executed a Confidentiality and NonDisclosure Agreement Agreement, a true and correct copy of which is attached hereto as **Exhibit "J."** In addition, on January 29, 2007, Owen

-10-

executed a Use & Compliance Agreement, a true and correct copy of which is attached hereto as **Exhibit "K,"** for use of the MTI laptop. The Use & Compliance Agreement expressly states that upon termination the laptop is to be returned to MTI. In addition, it contains a provision that states, "Do not format or FDISK the hard drive or delete any data." Owen tendered his resignation on July 20, 2007. MTI is informed and believes that Owen was immediately hired by FusionStorm, and is currently still employed by FusionStorm.

41. On or about April 16, 2006, MTI hired Heeki Park as a Senior Implementation Specialist. Park executed a Confidentiality and NonDisclosure Agreement on November 16, 2006, a true and correct copy of which is attached hereto as **Exhibit "L."** On May 1, 2006, Park executed a Use & Compliance Agreement, a true and correct copy of which is attached hereto as **Exhibit "M,"** for use of the MTI laptop. Park tendered his resignation on July 19, 2007. MTI is informed and believes that Park was immediately hired by FusionStorm, and is currently still employed by FusionStorm.

42. On or about September 25, 1995 MTI hired Greg Prestininzi as a Sales Representative. Prestininzi executed a Consultant/Employee Proprietary Information Agreement, a true and correct copy of which is attached hereto as **Exhibit "N."** On April 1, 2002, Prestininzi executed a Use & Compliance Agreement, a true and correct copy of which is attached hereto as **Exhibit "O,"** for use of the MTI laptop. Prestininzi tendered his resignation on July 19, 2007. MTI is informed and believes that Prestininzi was immediately hired by FusionStorm, and is currently still employed by FusionStorm.

43. On or about November 30, 2004, MTI hired Thomas Tar as an Implementation Specialist. On January 3, 2005, Tar executed a Confidentiality and NonDisclosure Agreement Agreement, a true and correct copy of which is attached hereto as **Exhibit "P."** On January 3, 2005, Tar executed a Use & Compliance Agreement, a true and correct copy of which is attached hereto as **Exhibit "Q,"** for use of the MTI laptop. Tar tendered his resignation on July 20, 2007. MTI is informed and believes that Tar was immediately hired by FusionStorm, and is currently still employed by FusionStorm.

44. As part of their duties as sales representatives, sales engineers, system engineers, telemarketers, implementation specialists, and technical architects, these MTI employees developed business contacts with MTI's customers and employees. For the purpose of enabling its employees to conduct their employment duties, MTI revealed to its employees necessary confidential information regarding MTI's customers, including but not limited to, sales volume, profit margins, particular likes and dislikes, system needs, maintenance contracts, and price quotes.

45. At all times, MTI employees were advised and aware of the confidential nature of the above-referenced information; their offer letters of employment also set forth the proprietary nature of the information they would receive and MTI requested that each employee sign an Employment Agreement which contained non-disclosure provisions. Moreover, MTI possessed an employee handbook and Code of Ethics addressing the proprietary nature and confidentiality issues. All of these steps taken by MTI were reasonable efforts to secure its trade secret information.

## FUSIONSTORM'S SCHEME TO RAID MTI'S EMPLOYEES
## FOR THE PURPOSE OF OBTAINING MTI'S EAST COAST BUSINESS

46. This Complaint targets an unlawful and anti-competitive scheme by FusionStorm to devastate MTI's operations in North America, and obtain MTI's East Coast Division, along with MTI's customers and goodwill, stealing MTI's business without payment. MTI's East Coast Division was responsible for a significant portion of MTI's revenues and profits. FusionStorm knowingly and intentionally recruited and solicited key revenue-generating employees of MTI, and those employees' support staff, comprising the East Coast Division, while simultaneously professing an interest in purchasing or merging with MTI, for the purpose of obtaining access to MTI's internal financial data, and thereby confirming the economic value of MTI's East Coast Division. When the East Coast Division left MTI, it took MTI's customers, and significantly all of

the pending orders, with them. With the loss of MTI's East Coast Division, MTI lost a significant stream of revenue, which dramatically impacted its cash flow position, causing it to implode, and seek Chapter 11 protection within a matter of months. Moreover, the loss of the East Coast Division also caused INX, a potential buyer of the MTI company, to withdraw its $21,000,000 offer to purchase MTI. Had the East Coast Division stayed with MTI, MTI would not have ended up in this Chapter proceeding.

47. Pursuant to said scheme, Defendants have employed the unfair and unlawful competitive tactics alleged herein to intentionally and deliberately injure MTI's business. MTI is informed and believes that FusionStorm specifically targeted MTI as the victim of its anti-competitive raid to obtain MTI's firmly established east coast EMC-solution practice.

48. In targeting the East Coast Division, FusionStorm was able to buy a company without paying for it. Upon leaving MTI and commencing work for FusionStorm, the East Coast Division simply "switched hats" from MTI to FusionStorm. Those employees were able to hit the ground running, taking their customers with them, with the customers having no interruption of business. MTI is informed, upon information and belief, that MTI's customers were advised that "MTI is now FusionStorm."

### WHILE STILL EMPLOYED BY MTI, FRANZ SOLICITED MTI'S EMPLOYEES TO JOIN FUSIONSTORM

49. MTI hired defendant Franz on or about August, 2003. From his date of hire to his resignation in May, 2007, Defendant Franz worked for MTI as an Account Executive, specializing in selling EMC data storage solutions to a number of MTI customers.

50. Franz's employment with MTI was subject to a Confidentiality and Nondisclosure Agreement (the "Franz Non-Solicitation Agreement") (Exhibit "D"), which Franz signed on or about August 18, 2003, restricting him from soliciting MTI employees on behalf of other

-13-

1 employers during and after his employment with MTI.

2     51.    Franz gave notice of his intention to terminate his employment with MTI on May 14, 2007; his official last day of employment was May 28, 2007, but he agreed to continue servicing his MTI accounts until the end of the fiscal quarter, on June 30, 2007.

    52.    Franz breached the terms of the Franz Non-Solicitation Agreement and his duties of loyalty to MTI by soliciting MTI's employees to terminate their employment with MTI and to thereafter become employed by FusionStorm. Franz continued to breach the Franz Non-Solicitation Agreement after his employment ended on June 30, 2007. Indeed, MTI is informed and believes that Franz, alone and with Bocchinfuso, continued to be one of FusionStorm's main recruiters of MTI's employees throughout July, 2007.

    53.    MTI is informed and believes that Franz solicited and attempted to solicit, alone, and with Bocchinfuso and others, at least 14 key, highly skilled MTI employees to join FusionStorm by making false, misleading, and disparaging statements about MTI. Among other things, Franz told MTI employees that other key employees would likewise be quitting in the near future and joining him at FusionStorm, and that FusionStorm would provide better pay and would reward employees for business they moved from MTI to FusionStorm.

    54.    Franz also disparaged MTI's operations, telling one targeted employee, for example, that because of the impending "mass defection" of employees, MTI would be forced to shut down certain operations.

    55.    Moreover, Franz made the false statements to targeted MTI employees that FusionStorm was in the process of acquiring MTI, and that MTI had entered into a contract with FusionStorm pursuant to which MTI waived its right not to have FusionStorm unlawfully solicit MTI's employees.

    56.    Franz did not limit his solicitation of MTI employees to the west coast, out of

which he worked. MTI is informed and believes that Franz further breached the terms of the Franz Non-Solicitation Agreement as well as his duties to MTI by providing to defendant Varel and other FusionStorm executives the necessary introductions to MTI's most valuable east-coast employees, thereby providing Varel with the opportunity to "cherry pick" MTI's East Coast operations and to solicit MTI's strongest and most productive employees to leave MTI, and join FusionStorm.

57.  In order to circumvent the MTI employees' Employment Agreements, and maintain the façade that the MTI employees had not been solicited by FusionStorm, or Franz, the MTI employees were instructed, by Franz and others, including FusionStorm, to send their resumes to FusionStorm through their online website. MTI is further informed and believes that, as a direct result of the breach of the Franz Non-Solicitation Agreement and of Franz's duties to MTI, FusionStorm extended written employment offers to MTI's key East Coast employees, with the purpose and effect of closing down MTI's east coast operations.

58.  On information and belief, at all material times alleged herein, Varel and Serpico were the agents of FusionStorm and/or employed by FusionStorm, and in doing the acts alleged herein were acting within the scope of such agency and/or employment relationship and that each are responsible in some manner for the wrongful acts alleged herein and that the damages suffered by Plaintiff is a direct and proximate result thereof.

59.  On information and belief, from on or about May 28, 2007 through and including the present, Franz was and is the agent and/or employed by FusionStorm, and in doing the acts alleged herein was and is acting within the scope of such agency and/ or employment relationship.

-15-

## WHILE EMPLOYED BY MTI, LINSKY AND PRESTININZI PLAY KEY ROLE IN ORCHESTRATING THE MASS DEFECTION OF THE MTI EAST COAST DIVISION ALONG WITH MTI'S CUSTOMERS TO FUSIONSTORM

60.     On information and belief, defendants Linsky and Prestininzi, along with Franz and Bocchinfuso, were key players in the raiding of MTI East Coast Division by FusionStorm. On information and belief, Linsky, and Prestininzi were solicited by FusionStorm, along with defendant Bocchinfuso, as alleged below, to acquire all, or substantially all of the East Coast Division for FusionStorm, and for their efforts they would be paid by FusionStorm a six-figure bonus.

61.     While still employed by MTI, Linsky and Prestininzi, with Bocchinfuso, planned the mass defection of the East Coast Division, and along with it, the transfer of MTI customers, to FusionStorm.

62.     During this period, Linsky, Prestininzi, and Bocchinfuso all told MTI CEO Thomas Raimondi that they were not considering leaving MTI to work for competitor FusionStorm. Instead, they reassured him that they would stay at MTI as long as MTI "sweetened" their compensation package. During this time frame, Bocchinfuso, as an officer, was included within highly confidential strategic meetings regarding the future of MTI.

63.     As stated above, Linsky, Prestininzi and Bocchinfuso had non-solicitation covenants in their Employment Agreements. As such, soliciting fellow employees on behalf of a competitor was prohibited. Linsky, Prestininzi and Bocchinfuso had access to MTI confidential information and trade secrets in the form of customer price quotes for pending orders, knowledge of customers' needs, maintenance contracts, customers' systems, and other valuable information that they learned as a result of their employment at MTI. Using this confidential knowledge, they were able to begin their solicitation of employees and customers on FusionStorm's behalf, setting

about to convince the entire team, along with MTI's customers, to leave MTI for FusionStorm. Linsky, Prestininzi and Bocchinfuso knew that MTI's customers would want to keep working with the same east coast team because of their EMC training and experience, and familiarity with the team members, from the course of dealings. Therefore, the easiest way to ensure the customers would follow with the team, was to bring the *entire* team over to FusionStorm, and the customers were told that they would never know the difference, since they (the customers) would be serviced with their EMC products from "head to toe" as they had been while the team was employed at MTI.

### FUSIONSTORM CONSPIRES WITH MTI VICE PRESIDENT RICHARD BOCCHINFUSO TO SOLICIT MTI'S EAST COAST DIVISION

64. Bocchinfuso was an officer of MTI. As an officer, Bocchinfuso owed MTI a fiduciary duty of loyalty, including without limitation, the duty to refrain from activities or conduct that would compete with or otherwise harm MTI's business.

65. Bocchinfuso signed the Confidentiality Agreement (Exhibit "A"). ¶7.1 of that agreement states: "I agree that, during my consulting relationship with the Company, I will not engage in any business activity that is or may be competitive with, or that would otherwise conflict with, my consulting relationship with the Company." ¶7.2: of that agreement states "…I agree that I will not during or after my consulting relationship with the Company for myself or for any third party, directly or indirectly: (ii) employ, solicit for employment, or recommend for employment any person employed by the Company…"

66. Commencing in or about approximately June, 2007, Bocchinfuso breached his duty of loyalty to MTI, by among other things, utilizing his knowledge and confidential information of MTI's employees to assist FusionStorm to entice away no less than ten (10) carefully selected employees of MTI's East Coast Division; in personally soliciting MTI employees to quit their

-17-

positions with MTI, without notice, and become employed by FusionStorm with the intent of using MTI's trade secrets to benefit FusionStorm; using MTI's trade secrets and revealing such information to FusionStorm so they could make elaborate employment offers, including above normal signing bonus offers (from $35,000 - $250,000) to MTI employees, that would be difficult to resist; utilizing his knowledge and confidential information of MTI's customers, providing a list to FusionStorm to assist soliciting and selling to MTI's customers prior to the conclusion of his employment with MTI, and continually assuring MTI's management and fellow officers that he was "not leaving the company for FusionStorm," and was "trying to avert employees from leaving MTI," when in fact, he was conspiring with competitor FusionStorm to assist the mass exodus.

67.     Bocchinfuso carefully identified and solicited no less than 12 key MTI employees to leave MTI and become employed by FusionStorm. Bocchinfuso made false representations to MTI's employees to the effect that FusionStorm was acquiring MTI, that MTI was insolvent and soon would be incapable of paying its employees, and that MTI waived its right not to have FusionStorm unlawfully recruit and solicit MTI employees.

68.     Bocchinfuso, Franz, Linsky, and/or Prestininzi also provided to FusionStorm contact information for MTI employees, some of whom were then directly contacted by FusionStorm and told to submit their resumes to FusionStorm's online employment website, in order to avoid any allegation of improper solicitation by FusionStorm.

69.     Bocchinfuso was successful as he convinced Butts, Dwyer, Griffin, Krekoukias, Linsky, Owen, Park, Prestininzi, and Tar, to leave MTI simultaneously, and without notice. In fact, it is Plaintiff's belief that the solicitation and mass defection of the MTI employees was coordinated so that all of the employees would provide notice of their resignations on the very same day and time.

70. The extent of the East Coast Division's planning and execution of their synchronized resignation was well-organized and coordinated. Communication occurred via the defendants' blackberry devices, and home email accounts, as both were untraceable by MTI, a fact well known to these defendants in the IT industry. The defendants met and discussed the exact method by which they would resign. Furthermore, while still employed by MTI, these employees discussed with FusionStorm's legal counsel the issue of breach of their MTI employment confidentiality contracts.

71. In addition, the defendants conspired to solicit their existing MTI customers and prospective customers to transfer their business relationships from MTI to FusionStorm. In fact, as part of their employment with FusionStorm they were to list all of "their" customers that they would be bringing to FusionStorm. In fact, all of these customers were those of MTI's.

72. Bocchinfuso, and the others, also acted unlawfully by deleting information contained on MTI's laptop computer, and instructing the other 10 MTI employees to do the same by emailing them to "start laptop cleanup proceedings." The information that was deleted constituted MTI's confidential information including, but not limited to pricing, services, equipment and systems, maintenance contracts, renewal dates, renewal pricing, and price quotes for new pending orders. Upon information and belief, the defendants deleted their pending MTI customer sales orders worth several million dollars, which subsequent sales were transferred to their new employer-FusionStorm.

73. Bocchinfuso's breach of his fiduciary duty of loyalty has caused harm to MTI, including the simultaneous loss of no less than ten (10) employees, without notice, which constituted substantially all of the East Coast Division, interference with MTI's business, loss of MTI's East Coast customers and their sales, and damage to its reputation in the east coast market.

74. The foregoing acts were willful and malicious and were performed with the intent

to damage MTI's business. Plaintiff is therefore entitled to an award of exemplary damages according to proof at trial.

### FUSIONSTORM FEIGNS INTEREST IN MERGING/PURCHASING MTI, SIGNS A CONFIDENTIALITY AND NON-SOLICITATION AGREEMENT WITH MTI, AND IMMEDIATELY THEREAFTER BREACHED THIS AGREEMENT BY RAIDING MTI'S OPERATIONS

75. On or about June 19, 2007, defendant Varel, in his capacity as Chief Executive Officer and Chairman of the Board of FusionStorm, entered into a "Mutual Confidentiality Agreement" with MTI (the "Confidentiality Agreement," a true and correct copy of which is attached hereto as **Exhibit "R"**), for the purpose of obtaining confidential information from MTI with the feigned intent of merging/purchasing MTI. That contract forms part of the basis of this action.

76. The purpose of the Confidentiality Agreement was to protect and preserve the confidential and /or propriety nature of information and materials that were disclosed or made available in connection with certain discussions, negotiations, or dealing between the parties relating to a potential strategic transaction. On information and belief, however, FusionStorm initiated communications with MTI in connection with this potential transaction for the purposes of obtaining MTI's confidential information and facilitating its intended raid on MTI's operations, employees, and customers. Specifically, FusionStorm used this opportunity to confirm the revenue and profit that the East Coast Division could provide on the pretense of conducting due diligence of MTI's financial records.

77. Pursuant to paragraph 10 of the FusionStorm Agreement, MTI and FusionStorm each agreed *inter alia*, that "during the period until the Purpose [of the contract] is completed and for one (1) year thereafter, it [would] not (for itself or any third party) divert or attempt to divert

-20-